**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RODELLA SMITH,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 15-3639** |
| **v.** | : | |
| | : | |
| **WESTERN SKY FINANCIAL, LLC,** *et al.*, | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                                                 **MARCH 4, 2016**

## MEMORANDUM

This case presents an unusual and disconcerting collision between federal consumer protection laws and the sovereignty of Native American tribes and their courts. Defendants here make "payday" loans across the United States through the Internet, and they seek to have their loan agreements governed by tribal law and challenged only in certain tribal courts or arbitral forums. Given the historic injustices visited upon Native Americans, the Supreme Court has understandably admonished that federal courts should tread lightly when it comes to intruding upon their sovereignty. *See Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9 (1987). Defendants here invoke these principles in moving to dismiss Plaintiff's case. For the reasons set forth below, I have concluded that Native American sovereignty is not at stake in this case, and I agree with the Fourth Circuit (among others) that Defendants seek "to avoid federal law and game the system." *Hayes v. Delbert Servs. Corp.*, No. 15-1170, 2016 WL 386016, at *9 (4th Cir. Feb. 2, 2016). Defendants' Motion to Dismiss will be denied.

## I. Facts of this Case

Plaintiff Rodella Smith alleges that she is the victim of a high-cost payday lender who has cloaked himself in the protections of tribal sovereignty and a series of shell companies to

1

avoid complying with state and federal laws.  On March 7, 2012, Plaintiff Rodella Smith took

out a loan from Defendant Western Sky Financial, LLC in the amount of $5,000.  First Amended

Complaint ("FAC") at ¶ 8; Western Sky Consumer Loan Agreement ("Loan Agreement"), Ex. A

to Defs.' Mot. Dismiss, at 1.  According to the terms of the Loan Agreement, which she viewed

online and signed electronically, the loan was subject to an annual percentage rate of 116.73%,

and the repayment term was set for a period of about seven years, resulting in a total payment of

$41,172.61.  Loan Agreement at 1.  Almost immediately, the loan was sold to Defendant

CashCall, Inc. on March 10, 2012, and then subsequently sold to Defendant Delbert Services

Corp. on September 30, 2013.  Defs.' Mot. Dismiss at 7.

    Plaintiff alleges that Western Sky is a limited liability company registered and

maintaining a principle place of business in South Dakota; Western Sky disagrees, describing

itself as "an entity imbued with the rights and privileges of [Cheyenne River Sioux] tribal

membership" and stating in the Consumer Loan Agreement that it does not have a presence in

any state of the United States.  Defs.' Mot. Dismiss at 13; Loan Agreement at 3.  The Consumer

Loan Agreement also states that "execution of this Agreement is made as if you were physically

present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign

Native American Tribal Nation."  Loan Agreement at 3.  Defendants CashCall and Delbert do

not profess to have any tribal affiliation.

    Plaintiff alleges that she made payments on the loan for the first two years, but by the

time she had paid $13,000—more than double what she had originally borrowed—she refused to

make further payments.  FAC at ¶¶ 9–10.  In 2014, one or all of the Defendants allegedly started

calling and emailing Plaintiff and her granddaughter demanding payment.  FAC at ¶ 11.  Plaintiff

filed this Amended Complaint on August 27, 2015, alleging that Defendants have violated state

usury law, as well as federal statutes including the Fair Debt Collection Practices Act, Fair Credit Extension Uniformity Act, and the Unfair Trade Practices and Consumer Protection Law.  She seeks damages and an injunction.

Defendants have moved to dismiss the FAC under the doctrine of *forum non conveniens* or the doctrine of tribal exhaustion; or, alternatively, to compel arbitration of the dispute.  Defs.' Mot. Dismiss at 1.  Defendants point to the broad forum selection and choice of law provisions contained in the underlying Consumer Loan Agreement and argue that these require Plaintiff to seek relief from the Cheyenne River Sioux Tribe (CRST).  Defs.' Mot. Dismiss at 1–2.[1]

## II. Broader Factual Background

Defendants support their motion with a selective presentation of cases.  They fail to disclose a broader and more troubling picture.  This Motion comes before the Court in the context of extensive litigation regarding Defendants' business practices.  It is true that Defendants have occasionally prevailed by asserting these same arguments against borrowers in other federal courts.  *See, e.g., Yoroma v. Cashcall, Inc.*, No: 15–08–GFVT, 2015 WL 5475258 (E.D. Ky. Sept. 16, 2015), *appeal docketed*, No. 15-6159 (dismissing to enforce arbitration agreement); *Brown v. W. Sky Fin., LLC*, 84 F. Supp. 3d 467, 481 (M.D.N.C. 2015) (dismissing to allow tribal exhaustion); *Heldt v. Payday Fin., LLC*, 12 F. Supp. 3d 1170, 1193 (D.S.D. 2014) (staying case to allow tribal exhaustion).  Significantly, however, it appears that every Court of Appeals that has considered this loan scheme has refused to dismiss the case or compel

---

[1] Plaintiff challenges Defendants' reliance on the Loan Agreement, arguing that this is an extrinsic document upon which the Court may not rely without converting the Motion into one for summary judgment.  Pl.'s Resp. Mot. Dismiss at 5.  The Third Circuit has held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  I do not read Plaintiff's Response to challenge the authenticity of the Loan Agreement, but rather to only challenge its consideration by the Court at this stage.  While the Complaint does not mention the Loan Agreement outright, her claims appear to be based on the loan created by that document, and I will therefore consider it in my decision on Defendants' Motion to Dismiss.

arbitration.  *See Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014), *cert. denied sub nom.*, *W. Sky Fin. v. Jackson*, 135 S. Ct. 1894 (2015); *Inetianbor v. Cashcall, Inc.,* 768 F. 3d 1346 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015)[2]; *Hayes*, No. 15-1170, 2016 WL 386016, at *7.

In addition, The Federal Trade Commission and similar agencies from a number of states have filed complaints against Defendant Western Sky Financial and other affiliated companies, many resulting in consent agreements.  *See, e.g., FTC v. Payday Fin., LLC*, No. 11- 03017, Stipulated Order for Injunction and Civil Penalties (D.S.D. April 4, 2014); *Commonwealth of Pennsylvania Dep't of Banking and Sec. v.  Cashcall*, No. 130055 (BNK-CAO), Consent Agreement and Order (July 17, 2014).  The FTC Complaint in particular characterizes Western Sky's argument that CRST courts have jurisdiction over these cases as a misrepresentation that constitutes a deceptive trade practice.  *FTC v. Payday Fin., LLC*, No. 11-03017 (D.S.D. 2011), Doc. 44 at 21.  As described by the Fourth Circuit, "a stream of private and public enforcement actions seem to have led Western Sky to stop issuing new loans in 2013."  *Hayes,* No. 15-1170, 2016 WL 386016, at *9.

### III. Forum Selection Clause

The Loan Agreement in question provides that it "is subject to the exclusive laws and jurisdiction" of the CRST, and the borrower consents to the subject matter and personal jurisdiction of the CRST by signing the agreement.  Loan Agreement at 1.  Defendants therefore argue that Plaintiff has thus waived her right to bring suit in this Court for any dispute relating to the loan agreement, and the Court must dismiss the action under the doctrine of *forum non conveniens* so that Plaintiff may bring her claims in a CRST Court.

---

[2] As discussed below, the 11th Circuit later remanded a case for reconsideration by a district court, but it did so more on procedural grounds.

I recognize the importance of respecting tribal sovereignty and in no way desire to limit **appropriate** access to tribal courts. But I also recognize that any legal system may be subject to manipulation, and allowing lenders to evade the enforcement of laws by cloaking themselves in the protection of the tribe ultimately obstructs the success of tribal courts and diminishes the respect they are owed.[3]

Despite Defendants' best efforts to compel Plaintiff to bring her claims in a tribal court, I find the clause unenforceable. A forum selection does not suffice to create jurisdiction, which depends upon a grant of judicial authority from Congress. While consent may be sufficient to establish personal jurisdiction over a party to a contract, "a tribal court's authority to adjudicate claims involving nonmembers concerns its subject matter jurisdiction, not personal jurisdiction." *Jackson v. Payday Fin.,* 764 F.3d at 783 (citing *Nevada v. Hicks*, 533 U.S. 353, 367 n.8 (2001)). Unlike the general jurisdiction enjoyed by state courts, the subject matter jurisdiction of tribal courts over persons who are not members of the tribe is limited, and "a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction." *Nevada v. Hicks*, 533 U.S. at 367–68; *see also Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008). "Therefore, a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court." *Jackson v. Payday Fin.*, 764 F.3d at 783. Consequently, the enforceability of the forum selection clause depends upon whether the CRST courts could exercise subject matter jurisdiction over Plaintiff's claims apart from the parties' agreement.

> [T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Nevertheless, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on

---

[3] *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 804 (2012).

their reservations, even on non-Indian fee lands." *Id.* Recognizing this limited right, the Court in *Montana* articulated two narrow situations in which a tribe may exercise jurisdiction over nonmembers: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565, 566.

*Id.* at 781–82.

Defendants seem to argue that the present case implicates both of the situations described in *Montana* because: "(1) Western Sky, as an entity owned by a tribal member, enjoys the rights and privileges of tribal membership; (2) the instant dispute relates to Smith's consensual commercial relationship with Western Sky; and (3) the commercial conduct underlying the dispute occurred on the Reservation." Defs.' Mot. Dismiss at 12.

The Seventh Circuit considered these same arguments in *Jackson v. Payday Financial* and found that the loan providers did not meet their burden of establishing tribal court jurisdiction. 764 F.3d at 781–85. It noted that, regardless of whether any of the loan entities could be considered a tribal member for purposes of a *Montana* analysis, "[t]he question of a tribal court's subject matter jurisdiction over a nonmember ... is tethered to *the nonmember's actions... on the tribal land*." *Id.* at 782 n.42. Although the loan agreement requires the borrower to certify that it is "as if" he is physically present within the boundaries of the Cheyenne River Indian Reservation when executing the agreement, this legal fiction is clearly just that. Plaintiff applied for the loan and made payments on the loan from Pennsylvania, and loan servicing was conducted by CashCall and Delbert off of the reservation. Although by their very nature contracts formed over the Internet create ambiguity as to place, I agree with the Seventh Circuit that "the Plaintiffs' activities do not implicate the sovereignty of the tribe over its

land and its concomitant authority to regulate the activity of nonmembers on that land," and the tribal courts therefore do not have jurisdiction over Plaintiff's claims. *Id.* at 781–83.

## IV. Tribal Exhaustion

Defendants next argue that even if the Court declines to dismiss on the basis of the forum selection clause, it is required to dismiss the case based on the doctrine of tribal exhaustion. Defs.' Mot. Dismiss at 3. This principle requires a federal court to "stay[] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction." *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985). However, exhaustion is not required "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *Id.* at 857 n.21 (1985) (internal citation omitted); *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31–32 (1st Cir. 2000) ("the tribal exhaustion doctrine does not apply mechanistically," and "an inquiring court must make a particularized examination of the facts and circumstances attendant to the dispute in order to determine whether comity suggests a need for exhaustion of tribal remedies as a precursor to federal court adjudication.").

Once again, the Seventh Circuit considered this same argument and determined that tribal exhaustion was unnecessary:

> The present dispute does not arise from the actions of nonmembers on reservation land and does not otherwise raise issues of tribal integrity, sovereignty, self-government, or allocation of resources. There simply is no colorable claim that the courts of the Cheyenne River Sioux Tribe can exercise jurisdiction over the Plaintiff[]. Tribal exhaustion, therefore, is not required.

*Jackson v. Payday Fin.*, 764 F.3d at 786.

I find this reasoning persuasive and conclude that Defendants here have likewise not presented a "colorable" claim that CRST courts have jurisdiction over Plaintiff. Dismissal for tribal exhaustion is therefore unnecessary.

## V. Arbitration

Defendants argue in the alternative that Plaintiff's claims should be dismissed because the Loan Agreement's Arbitration Clause requires arbitration of this entire dispute. Defs.' Mot. Dismiss at 15–16.

The Loan Agreement provides that, unless the borrower exercises his right to opt out of arbitration, "any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." Loan Agreement at 4. The Agreement later stipulates that a party may choose to have the arbitration administered by the American Arbitration Association, JAMS, or any other organization agreed to by all parties, but the arbitration will only be governed by that organization's rules and procedures "to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate …" *Id.* The agreement further provides:

> THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Nation and the terms of this Agreement.

*Id.* at 5. The arbitration clause professes to bind the borrower to arbitration against Western Sky or any note holder or servicer, and it says the range of disputes covered by the clause is to be as broad as possible. *Id.* at 4.

8

Although the parties do not address the broader context in which the case arises, I find it instructive.  The arbitration agreement before me is just the latest iteration employed by Western Sky and its affiliates in seeking to avoid the reach of federal law.  Previous versions have withered under the scrutiny of circuit courts, which found the prescribed arbitral forum to be illusory.  *See, e.g., Jackson v. Payday Fin.*, 764 F.3d at 776, 779 (pointing out that "[t]he record clearly establishes … that such a forum does not exist: The Cheyenne River Sioux Tribe 'does not authorize Arbitration,' … and it does not have consumer dispute rules" and labeling the process as "a sham from stem to stern."); *Inetianbor*, 768 F. 3d at 1354 ("Mr. Inetianbor presented the District Court with a letter from the Tribe explaining that 'the Cheyenne River Sioux Tribe, the governing authority[,] does not authorize Arbitration.' … [B]ecause 'this is a private business deal[, t]he Tribe has nothing to do with any of this business.' ").  Within the Third Circuit, failure of a chosen forum will preclude arbitration if the choice of forum is "an integral part" of the arbitration agreement.  *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012).

The "improved" Loan Agreement at issue in this case now includes a clause allowing an outside organization to administer the arbitration, which was not present in the contract considered by *Jackson*.  This is mere artifice.  The Fourth Circuit recently considered a nearly identical Loan Agreement and found its arbitration clause unenforceable.  That Court considered the agreement in the context of the choice-of-law provisions in the entire document and found that:

> This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims. … With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away.  The just and efficient

system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

*Id.* at *6.

The broad reach of the Federal Arbitration Act cannot be invoked to avoid federal law: "while the [Supreme] Court has affirmed that the FAA gives parties the freedom to structure arbitration in the way they choose, it has repeatedly cautioned that this freedom does not extend to a 'substantive waiver of federally protected civil rights' in an arbitration agreement." *Hayes*, No. 15-1170, 2016 WL 386016, at *7 (citing *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 273 (2009)). The purpose of the arbitration agreement at issue here is not to create a fair and efficient means of adjudicating Plaintiff's claims, but to manufacture a parallel universe in which state and federal law claims are avoided entirely.

Defendants' artfully-worded motion ignores the fact that, per the terms of the Loan Agreement, the arbitrator would not be permitted to consider *any* of the claims that Plaintiff asserts in her Complaint since the arbitrator would be prohibited from applying the relevant law. "[A] party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Hayes*, No. 15-1170, 2016 WL 386016, at *8. Moreover, the clause that limits the authority of the arbitrators, stating that JAMS may preside only "to the extent that those rules and procedures do not contradict … the law of the Cheyenne River Sioux Tribe," must be read skeptically when viewed against the backdrop of the circuit cases discussed above. Three circuit courts have concluded that a CRST arbitration mechanism simply did not exist. Putting to one side the fact that substantively, the Agreement is meant to gut the federal laws that would otherwise control, procedurally, just how would JAMS determine whether any hearing it convened complied with the apparently non-existent rules of the tribe? I agree with

those circuits that a close reading of the arbitration clause compels the conclusion that it is unenforceable.

Defendants have filed a supplemental brief stating that a motion for rehearing has been filed in *Hayes,* despite the fact that there was no dissent on the panel,[4] and they advance the same arguments here.  Specifically, they contend that under the terms of the Agreement, it is for the arbitrators to decide in the first instance whether the dispute is arbitrable, relying upon *Parnell v. CashCall, Inc.,* 804 F.3d 1142 (11th Cir. 2015).[5]  *Parnell* does not alter my analysis, because the point it makes is procedural rather than substantive.  It held that because the plaintiff had not directly challenged the validity of the delegation clause itself in the complaint, the district court should not have considered the challenge.  It is noteworthy that the Court then took pains to point out that the plaintiff could still seek to amend his complaint to raise such a challenge, even going so far as to drop a footnote stating that, although one amendment had already been allowed, Rule 15 provides that such leave should be "freely given."  *Id*. at 1149 n.2.  That somewhat transparent invitation to challenge the agreement is hardly surprising, in that the Eleventh Circuit had refused to enforce it only one month before in *Inetianbor*, *supra*, with one of the judges writing a concurring opinion describing the arbitration mechanism as a "sham."  *Id.* at 1354.

In its opposition to Defendants' Motion, Plaintiff has, albeit unartfully, challenged the arbitration scheme.  In view of the history reviewed above, I would certainly grant leave to amend to the extent that the Third Circuit might interpret *Rent-a-Center* in the same manner as the Eleventh Circuit did in *Parnell,* and require an explicit attack on the delegation clause in the complaint.   But fidelity to the law does not require a judge to be naïve or impractical.

---

[4] It bears mention that the majority opinion was authored by Judge J. Harvie Wilkinson, III.

[5] *Parnell* applied principles adopted by the Supreme Court in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010).

Necessarily, if there is no benchmark for JAMS or any other arbitrator to follow, this clause is equally illusory, just in a different way.  In practical terms, enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law.

Defendants are correct that all of the circuit decisions above are merely persuasive authority.  Suffice it to say I find them highly persuasive.

An order denying Defendants' Motion will be issued.

_____/s/ Gerald Austin McHugh
United States District Court Judge

12